739 F.2d 376
 MONTANA-DAKOTA UTILITIES CO., Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Colorado Interstate Gas Company, Intervenor,
Public Service Company of Colorado, Western Slope Gas
Company and Cheyenne Light Fuel and Power Company,
Intervenor,
MIGC, Inc., Intervenor.
 No. 84-1153.
 United States Court of Appeals,
Eighth Circuit.
 Submitted June 15, 1984.
Decided July 24, 1984.
Rehearing and Rehearing en banc Denied Aug. 24, 1984.
 
 Robert J. Haggerty, David P. Sutton, Phillip G. Lookadoo, Haggerty & Eisenhower, Washington, D.C., for Montana-Dakota Utilities Co.
 William M. Lange, Kim R. Cocklin, Colorado Springs, Colo., for intervenor Colorado Interstate Gas Company.
 William H. Satterfield, General Counsel, Jerome M. Feit, Sol., A. Karen Hill, Washington, D.C., for respondent Federal Energy Regulatory Commission.
 Before HEANEY and FAGG, Circuit Judges, and COLLINSON,* Senior District Judge.
 HEANEY, Circuit Judge.
 
 
 1
 The Montana-Dakota Utilities Company (MDU), seeks review of a July 23, 1983, order of the Federal Energy Regulatory Commission (Commission) refusing to modify its February 19, 1982, order issuing a certificate of public convenience and necessity to MDU and the Colorado Interstate Gas Company (CIG). MDU sought the modification to require CIG to purchase the maximum volumes of gas authorized under the certificate. We dismiss the petition because the Commission's 1982 order became final and binding under the provisions of 15 U.S.C. Sec. 717r when MDU failed to make a timely application for a rehearing and judicial review.
 
 Background
 
 2
 On August 12, 1981, MDU and CIG entered into an agreement under which MDU agreed to sell natural gas to CIG. The contract provided in part:
 
 
 3
 2.1 Seller agrees to sell to Buyer gas which it obtains from the sources of supply identified in Exhibit "B-1", * * * and Buyer agrees to receive and purchase such gas, pursuant to the terms of this Agreement * * *. It is understood that additional sources of supply may be necessary and that Exhibit "B-1" may be amended or superseded from time to time, without otherwise affecting this Agreement, in order to add or delete sources of supply, as the parties hereto may mutually agree.
 
 
 4
 * * *
 
 
 5
 * * *
 
 
 6
 3.1 Seller commits the following volumes to this Agreement:
 
 
 7
 3.1.1 The annual sales volume for each year of the first five years of this Agreement shall be 17 Bcf, and sales shall be on a firm annual basis. * * *
 
 
 8
 3.1.2 The annual sales volume for each year of the second five years of this Agreement shall be a maximum of 8.175 Bcf per year, and sales shall be on a best efforts basis. In no event shall Seller be obligated to sell greater annual quantities than tendered to Seller at the sources then listed in Exhibit "B-1". * * *
 
 
 9
 3.1.3 The annual sales volume for each year of the third five years of this Agreement shall be the volumes available to Seller at the sources of supply then listed in Exhibit "B-1", which Seller determines to be in excess of its system requirements. The annual sales volumes and delivery volumes shall be those mutually agreed to by the parties pursuant to paragraph 3.3 hereof.
 
 
 10
 3.2 If, during the first ten years of this Agreement, excess gas volumes in addition to the volumes listed in paragraphs 3.1.1 and 3.1.2 become available from the sources of supply listed on Exhibit "B-1", or from other sources, Seller will notify Buyer of the quantities and the period of time for which such volumes will be available. Buyer shall have the right of first refusal, to be exercised within 90 days after notification to purchase all or a portion of such additional volumes. The determination of availability of additional excess gas volumes and the determination of sources committed shall be within Seller's sole discretion.
 
 
 11
 3.3 The volumes to be sold, pursuant to paragraph 3.1.3, shall be determined in the following manner:
 
 
 12
 * * *
 
 
 13
 * * *
 
 
 14
 3.3.2 Within 90 days after October 1 of each year, Buyer shall notify Seller whether or not it can accept delivery of such volumes or, if it cannot accept all of such volumes, what volumes it can accept for such 24-month period. The volumes agreed upon by the parties shall be committed to be delivered to Buyer during such 24-month period.
 
 
 15
 3.3.3 Agreement of the parties upon such volumes shall not prevent Seller from delivering and Buyer from buying gas in excess of such volumes agreed upon.
 
 
 16
 * * *
 
 
 17
 * * *
 
 
 18
 4.2 If at any time the price or prices to be paid for all or a portion of the gas purchased from the sources of supply listed on Exhibit "B-1" are not controlled by any regulatory authority, * * * and Seller shall pay a price other than the prices in effect immediately prior to deregulation, Buyer's rate shall be adjusted accordingly; provided, however, that if Buyer, in its [sole] discretion, determines that such payment for gas hereunder causes or contributes to the loss of natural gas markets by Buyer, then Buyer shall have the option to reject such deregulated gas by giving 90 days notice to Seller. Buyer must present evidence substantiating its method of reaching the conclusion that the gas is not marketable on its system.
 
 
 19
 * * *
 
 
 20
 * * *
 
 
 21
 4.4 Payment. Buyer agrees to pay Seller on or before the 25th day of each month, or the next working day thereafter, for all gas purchased during the preceding month at the applicable rates for such volumes purchased, as shown on the statement referred to in Article IV(A) of Exhibit "A".
 
 
 22
 * * *
 
 
 23
 * * *
 
 
 24
 [Exhibit A, 12.1] * * * Any cancellation of this Agreement pursuant to the provisions of this section shall be without prejudice to the right of Seller to collect any amounts then due to it for gas taken and gas required to be but not taken prior to the time of cancellation, and shall be without prejudice to the right of Buyer to receive any gas for which it had paid but which it has not received although entitled thereto prior to the time of cancellation, and without waiver of any remedy to which the party not in default may be entitled for violations of this Agreement.
 
 
 25
 On February 19, 1982, the Commission entered an order granting certificates of public convenience and necessity authorizing MDU to construct facilities, sell gas to CIG, store and redeliver a portion of the gas to CIG, and authorizing CIG to take the gas from MDU. It also authorized CIG to construct certain pipelines and other facilities. The order of the Commission began with a section entitled "Background." That section recited in part:
 
 
 26
 The term of the proposed sale to CIG is fifteen years, divided into three five-year service periods. During the first five years, MDU would deliver, on a firm basis, up to 17,850,000 Mcf of gas per year with firm daily minimum volumes of 47,300 Mcf. During the second five years, MDU would sell, on a best efforts basis, up to 8,175,000 Mcf annually. During the third five-year period, volumes committed to the sale would be those available to MDU at the designated supply sources which in MDU's sole discretion are in excess of MDU's system requirements. CIG is not under any obligation to purchase any daily or annual minimum volumes under the contract. [Emphasis added; Footnotes omitted.]
 
 
 27
 The order contained a discussion section, which stated in part:
 
 Gas Supply
 
 28
 The supply projections provided by MDU clearly reflect substantial excess gas available which could be sold off-system helping to minimize MDU's take-or-pay exposure and at the same time providing needed operational flexibility in its gas acquisition program. * * * MDU projects annual surplus volumes for the next ten years to total 162.9 million Mcf. Recent intensive development around the MDU area, particularly in the Williston Basin region, is resulting in extensive oil-related gas production. Gas must be taken from the processing plants in order to maintain oil production. MDU's purchase contracts require that MDU take all of the gas tendered at the tailgate or face the possibility of incurring large take-or-pay obligations.
 
 
 29
 Historically, excess volumes available to MDU have been injected into MDU's storage fields (total capacity of 178.6 million Mcf). However, those storage facilities are near capacity levels. MDU's largest storage facility, Baker Storage Field (located in Montana with a total capacity of approximately 117 million Mcf) and the closest to the Williston Basin, is presently operating at capacity. Even though its storage facility at Elk Basin in northern Wyoming has a limited amount of available capacity, MDU projects volumes far in excess of that field's capability by mid-October 1982. [Emphasis added.]
 
 The Commission's order concluded:
 
 30
 (A) Upon the term[s] and conditions of this order, a certificate of public convenience and necessity is issued * * * authorizing MDU to sell and deliver and store for and redeliver natural gas to CIG for resale, as hereinbefore described * * * for the initial ten-year term under the terms of their contract and limited to the delivery points and sources of supply specified in the application * * *. [Emphasis added.]
 
 
 31
 A year after the order was entered, MDU filed a complaint with the Commission alleging that CIG had reduced its gas purchases nearly 80% below the levels authorized by the Commission. MDU asserted that CIG was required under the contract between the parties to purchase the authorized amounts in full and asked the Commission to order CIG to purchase such amounts.
 
 
 32
 The Commission dismissed MDU's complaint on June 23, 1983, stating:
 
 
 33
 The order of February 19, 1982, could not have been more explicit or definite with respect to CIG's purchase obligations. As MDU recognizes, we stated that "CIG is not under any obligation to purchase any daily or annual minimum volumes under the contract." 18 FERC at 61,299.
 
 
 34
 The quoted language is neither an inadvertent factual error, as MDU suggests, nor an added condition limiting CIG's obligation to purchase. Rather, that statement is the Commission's clear and explicit interpretation of a critical element of the authorization requested by MDU. The Commission expressly determined that there was no contractual minimum purchase obligation by CIG and acted upon that basis.
 
 
 35
 The scope of our certificate is clear on its face. The certificate of public convenience and necessity determines the service obligation under the Natural Gas Act. Sunray Mid-Continent Oil Co. v. FPC, 364 U.S. 137, 152-154 [80 S.Ct. 1392, 1401-1402, 4 L.Ed.2d 1623] (1960). By accepting the certificate, without requesting clarification or amendment, MDU agreed to perform the service as authorized therein.
 
 
 36
 * * *
 
 
 37
 * * *
 
 
 38
 Based upon the foregoing and in view of the fact that our certificate order expressly excluded any minimum purchase obligation, if MDU is aggrieved it was by entry of that order. MDU failed to file an application for rehearing objecting to our order of February 19, 1982, within thirty days after issuance of such order as required by Section 19(a) [15 U.S.C. Sec. 717r(a) ] of the Natural Gas Act. MDU now attempts to use its complaint and request for order as a procedural method to challenge that order long after the time has passed for requesting rehearing. [Footnote omitted.]
 
 
 39
 MDU requested a rehearing, again contending that CIG was obligated to purchase 17 Bcf of natural gas per year during the first five years of the contract. It offered to compromise by amending the certificate to provide that CIG be required to purchase only a percentage of its requirements from MDU. MDU acknowledged that it was aware of the language in the "Background" section of the February 19, 1982, order but did not file for a rehearing for "sound business reasons." Alternatively, MDU asked that the prior certificate authorization be amended to require CIG to make minimum purchases. The Commission denied MDU's request. It stated:
 
 
 40
 The order of February 19, 1982, explicitly set forth the Commission's interpretation of MDU's request for sales authorization as not including any minimum purchase obligation by CIG. * * * The Commission's interpretation of the application and contract was based on the absence of any reference in the contract or application to a minimum purchase obligation or to purchases being on a firm annual basis. * * * In addition, in the order of June 23, 1983, we found MDU's complaint to be an impermissible, untimely challenge to our order of February 19, 1982, in view of MDU's failure to file a timely application for rehearing.
 
 
 41
 * * * MDU now asserts that while it was aware of language in the Commission order of February 19, 1982, interpreting CIG's purchase obligation, it did not file for rehearing for "sound business reasons" because it could not wait months for corrective action in order to make the sale. * * *
 
 
 42
 * * *
 
 
 43
 * * *
 
 
 44
 * * * MDU accepted the certificate and began service thereunder, consciously deciding not to request rehearing and, therefore, is bound by the Commission's interpretation. [Footnote omitted.]
 
 
 45
 This appeal followed.
 
 Discussion
 
 46
 We have no alternative but to affirm. Section 717r of Title 15 to the United States Code provides the exclusive means to obtain judicial review of a Commission order. Cf. City of Tacoma v. Taxpayers of Tacoma, 357 U.S. 320, 335-336, 78 S.Ct. 1209, 1218-1219, 2 L.Ed.2d 1345 (1958) (exclusive means of reviewing Federal Power Commission orders). Moreover, the statute specifically requires an application for rehearing to the Commission within thirty days of the Commission's order as a jurisdictional prerequisite for review of a Commission order. Boston Gas Co. v. FERC, 575 F.2d 975, 977-978 (1st Cir.1978). Finally, the statute provides that no objection to a Commission order shall be considered by a reviewing court unless the objection was first made in an application for rehearing.
 
 
 47
 MDU argues that the question of whether the contract between MDU and CIG required minimum purchases by CIG was not actually litigated between the parties in the original proceeding, and thus the question is not foreclosed from litigation in the current proceeding. This argument misses the point. The Commission made it unmistakably clear in its original order that it read the contract between the parties as not requiring CIG to purchase the quantities of gas that MDU was obligated to sell. It then specifically stated in the order section of the certificate that "a certificate of public convenience and necessity is issued * * * authorizing MDU to sell * * * natural gas to CIG * * * for the initial ten-year term under the terms of their contract. [Emphasis added.]" The certificate issued only authorized conduct consistent with the Commission's reading of the contract, and MDU failed to timely contest the order granting that certificate.
 
 
 48
 MDU next argues that the Commission's characterization of the contract as imposing no minimum purchase obligation is totally devoid of a rational foundation and record support, and application of administrative res judicata in these circumstances is tantamount to a denial of due process and results in a manifest injustice. We cannot agree. The Commission's characterization has both a rational foundation and record support. The Commission, MDU and CIG were all very much aware that contracts could be written to require minimum purchases. Indeed, the original Commission order indicates that MDU was a party to such contracts. The contract here did not specifically require CIG to make minimum purchases and we cannot say that the Commission was necessarily wrong--much less irrational--in refusing to read such a guarantee into the contract. Even if we were to agree that the Commission erred in its interpretation of the contract, however, the error would be apparent on the face of the original order and MDU was obligated to seek a correction within the required time period.
 
 
 49
 MDU asks the Court to use its sound equitable powers to require the Commission to amend the certificate prospectively to reflect the minimum purchase obligation allegedly agreed to by the parties. It made a similar request to the Commission. The Commission stated that such relief would be inappropriate at "this stage of the proceeding." It stated that it would consider MDU's request on the merits if a proper application were made. We find no error in the Commission's action in this regard. Moreover, as the Commission noted, the equities may not be quite as clear as MDU asserts. If CIG is required to purchase more gas than it needs to meet its customer demands then its customers, rather than those of MDU, will be required to pay a higher price for the gas they need.
 
 
 50
 For the reasons stated, we dismiss the petition for review.
 
 
 
 *
 The Honorable William R. Collinson, United States Senior District Judge for the Western District of Missouri, sitting by designation