FUELS RESEARCH COUNCIL, INC., National Coal Association, Mid-West Coal Producers Institute, Inc., and United Mine Workers of America, Petitioners,

v.

FEDERAL POWER COMMISSION, Respondent.

Midwestern Gas Transmission Company, Natural Gas Pipeline Company of America, Peoples Gas Light and Coke Company, Northern Illinois Gas Company, and Northern Indiana Public Service Company, Intervenors.

No. 15515.

United States Court of Appeals Seventh Circuit.

Feb. 24, 1967.

Barnabas F. Sears, Hamilton K. Bee-
be, Chicago, Ill., John A. McGrath, Wash-
ington, D. C., Gerald M. Sheridan, Jr.,

Chicago, Ill., Boodell, Sears, Foster, Sugrue & Crowley, Lord, Bissell & Brook, Chicago, Ill., of counsel, for petitioners.

Edmund A. Schroer, Joseph T. Morrow, Lawyer, Schroer & Eichhorn, Hammond, Ind., for intervenor, Northern Indiana Public Service Co.

Justine A. Stanley, Robert A. Helman, David L. Lange, Isham, Lincoln & Beale, Richard E. Powell, C. Richard Johnson, Chicago, Ill., for intervenor, Northern Illinois Gas Co.

William W. Brackett, Charles C. McDugald, Steven L. Larson, Ross, Hardies, O'Keefe, Babcock, McDugald & Parsons, Chicago, Ill., for intervenor, Natural Gas Pipeline Co. of America.

Harry S. Littman, Jack Werner, Melvin Richter, Washington, D. C., H. R. Begley, Chicago, Ill., Harry S. Welch, Houston, Tex., for intervenor, Midwestern Gas Transmission Co.

Richard F. Babcock, Paul E. Goldstein, Raymond J. Petersen, Ross, Hardies, O'Keefe, Babcock, McDugald & Parsons, Chicago, Ill., for intervenor, Peoples Gas Light & Coke Co.

Richard A. Solomon, Paul A. Sweeney, Julius C. Meier, Abraham R. Spalter, Howard E. Wahrenbrock, F. P. C., Washington, D. C., for respondent.

Before SWYGERT, FAIRCHILD, and CUMMINGS, Circuit Judges.

SWYGERT, Circuit Judge.

The petitioners, three coal associations and a labor union,[1] seek review of an order[2] of the Federal Power Commission approving the existing rate designs of two interstate natural gas pipeline companies, Midwestern Gas Transmission Company and Natural Gas Pipeline Company of America. The order resulted from proceedings instituted by the Commission under section 5(a) of the Natural Gas Act, 15 U.S.C. § 717d (a), to determine whether the rate designs of Midwestern and Natural are "unjust, unreasonable, unduly discriminatory, or preferential." The principal questions concern the pipelines' two-part rate structures.

Natural Gas Pipeline Company is engaged in the transportation of natural gas through two interstate pipeline systems which commence in areas of production in Texas, Oklahoma, and Louisiana and which interconnect and terminate near Joliet, Illinois. Natural sells its product to customers located along its pipelines, but three of its four largest customers take delivery at the end of the pipelines in northeastern Illinois. These customers, The Peoples Gas Light and Coke Company, Northern Illinois Gas Company, and Northern Indiana Public Service Company (NIPSCO), are intrastate distribution companies which resell the gas to ultimate residential, industrial, and commercial consumers. Natural has been owned by Peoples since 1948.

Midwestern Gas Transmission Company transports natural gas through two separate interstate pipeline systems. In its southern system, the only one involved here, Midwestern purchases gas from its parent corporation, Tennessee Gas Transmission Company, at Portland, Tennessee and transports it to Joliet for sale to its only customers, Peoples, Northern Illinois, and NIPSCO.[3]

---

1. Fuels Research Council, Inc., National Coal Association, and Mid-West Coal Producers Institute, Inc. are voluntary, nonprofit Delaware corporations whose membership includes various producers and marketing agents of coal who compete with the distributor-customers of the natural gas pipeline companies involved in this proceeding. United Mine Workers of America is a national labor organization whose approximately 250,000 members are engaged in the mining and production of coal.

2. The order is contained in Opinion No. 477, issued September 28, 1965, 34 F.P.C. 973.

3. The gas transported by both Natural and Midwestern is delivered to Chicago District Pipeline Company at Joliet for the accounts of Peoples, Northern Illinois, and NIPSCO. Chicago District Pipeline, another subsidiary of Peoples, makes the actual delivery to the local distributors.

Natural and Midwestern are both "natural-gas compan[ies]" within the meaning of section 2(6) of the Natural Gas Act, 15 U.S.C. § 717a, and are therefore subject to regulation by the Federal Power Commission. The local distribution companies are not subject to such regulation. Peoples sells gas exclusively within the City of Chicago. Northern Illinois serves the remaining portion of northern Illinois. NIPSCO, a gas and electric utility, operates in northwestern Indiana. The rates of the distributors are regulated by the Illinois Commerce Commission and the Public Service Commission of Indiana, respectively.

The consolidated rate design proceeding of Natural and Midwestern has a checkered history. Following one unsuccessful effort, Midwestern and its parent, Tennessee, obtained a certificate of public convenience and necessity from the Commission for the operation of Midwestern's southern system in 1959.[4] The Commission at that time tentatively accepted the rate schedules proposed for sales to the distribution companies, but directed Midwestern to file a new rate schedule within one month after the first year of operation. The Commission indicated that a section 5(a) proceeding to determine the reasonableness of the rate filed would then be instituted.

On December 14, 1960 Midwestern did as it was requested, proposing to continue the same rates. Thereafter, on February 13, 1961, the Commission commenced an investigation pursuant to section 5(a).[5]

In the meantime, Natural, which has been in business since 1931, filed a rate increase. The Commission suspended the increase under section 4(e) of the act, 15 U.S.C. § 717c(e), and began hearings concerning the lawfulness of the rate. Eventually, on October 25, 1962, the Commission approved a settlement proposed by Natural and the staff of the Commission.[6] In its opinion approving the settlement the Commission noted, however, that Midwestern's rates were then under examination and stated that it would reopen the question of Natural's rate design under section 5(a) when it reviewed Midwestern's rate design. In February 1963, the Commission ordered the present investigation against Natural and consolidated it with the investigation against Midwestern.

The consolidated proceeding was set for hearing. The local distribution companies, Peoples, Northern Illinois, and NIPSCO, and the coal associations, among others, were permitted to intervene. The coal associations alone challenged the rate designs of Natural and Midwestern. All other participants, including the Commission staff, supported the existing structures.

 At this point the elements comprising the rate designs being challenged and the principal considerations upon which these elements are based require explanation. The first step in setting the rates to be charged by a regulated pipeline is the determination of the pipeline's "cost of service," that is, the total revenues required to cover the pipeline's cost of operation plus a fair return on its investment. Once the cost of service has been ascertained, rates are "designed" to recover it. For reasons allegedly related to different types of services desired by different customers but more realistically attributable to the basic economic laws of supply and demand as they concern natural gas, the "designing" operation is not reducible to a simple mathematical exercise.

One "demand" for gas, the demand by those consumers who can be made to pay for both the pipeline and the gas flowing through it, is highly seasonal in the midwestern states. The desirability of

4. Midwestern Gas Transmission Co., 21 F.P.C. 653 (1959).

5. During the course of the investigation, the issues concerning Midwestern's cost of service were divorced from the rate design issues. The Commission disposed of substantially all of the overall rate level issues in Opinion No. 444, issued October 13, 1964, 32 F.P.C. 993.

6. Natural Gas Pipeline Co., 28 F.P.C. 731 (1962).

gas for domestic and commercial space heating purposes in the winter, the "peak" period, is such that the demand for gas during that period by this type of consumer far exceeds the demand by the same consumer at other times of the year.[7] This economic fact creates a "valley" period, a capacity in the pipeline to supply other potential users during the "non-peak" season, including many whose "demand" is constant but so low that they would never become users if they were compelled to pay a proportionate share of the pipeline's cost of service. The valley periods might well go unfilled were it not for the principle, widely accepted by rate-makers, that a more complete utilization of existing facilities spreads the costs of the entire system to whatever extent the additional utilization contributes to the fixed costs of the facilities over and above the payment of variable costs.

The rate-making theory urged upon us blends a concept of "peak cost-responsibility" with a desire to take advantage of the above principle in the following manner. First, the proposition that a pipeline is built to serve the peak period demand is accepted as a fact.[8] Stated another way, the pipeline capacity provided to take care of the demand on peak days of the system is viewed as creating the bulk of the fixed costs of the pipeline company. These costs do not depend upon the amount of gas flowing through the pipeline. The variable or "volumetric" costs of pipeline operation are essentially related to the amount of gas transported and sold; they are incurred in proportion to the gas actually used. It follows that those responsible for the creation of the peak demand would bear the entire cost of pipeline operation were it not for the opportunity provided by

"valley filling" or "off peak" sales. Sales during valley periods (sales to those who will take gas if the price is right), since they do not require the construction of additional facilities, may and should be made at variable cost plus (as the Commission puts it) "such amounts in addition thereto as may be determined to be a proper contribution to the fixed charges," so that the fixed costs can be spread over more sales units, thus reducing the per unit costs.

The theory just described and the recognition that a pipeline's cost of service encompasses both fixed costs and variable costs have been reflected by rate-makers in the form of two-part rates. The rates are split into "demand" and "commodity" components. The demand component is a charge intended to reflect the fact that a customer has contracted for the right to take a given quantity of gas during the peak period. The demand charge is imposed whether the gas is actually taken from the system or not. The commodity component is a charge based upon the volume of gas consumed by each customer. The combination of these charges, multiplied by the anticipated units of the demand component to be contracted for plus the anticipated units of gas to be actually sold is expected to generate revenues equal to the cost of service. The significant problem posed by the two-part formula concerns the allocation of the costs of pipeline operation to the demand and commodity components, more specifically, to the determination of what contribution to the fixed costs of the system is to be recovered by the commodity charge. In the instant case the problem is accentuated, not because the customers of the pipeline, the distribution companies, have different peak demands, but

7. Certain uses of gas, for example, for cooking and water heating, continue throughout the year. Other seasonal uses exist, for example, summer air conditioning, but they do not approach the peak space heating demand.

8. See generally, Bonbright, Principles of Public Utility Rates (1961). But see the

view expressed by Mr. Justice Jackson in Colorado Interstate Gas Co. v. FPC, 324 U.S. 581, 615, 65 S.Ct. 829, 845, 89 L.Ed. 1206 (1945) (concurring opinion), that "I do not think it can be accepted as a principle of public regulation that industrial gas may have a free ride because the pipe line and compressor have to operate anyway * * *."

due to the fact that the price of gas to certain customers of the distribution companies during the "valley" periods is based upon the commodity component of the pipelines' rate design.

At the hearing before the examiner, the coal associations argued that two-part rates for Midwestern and Natural were invalid, that the proper rate was a straight one-part rate representing the average cost of each unit of gas sold to the distributors. They introduced expert testimony to indicate the one-part rate which would be necessary to recover Midwestern's cost of service. In their brief on this petition for review, the coal associations do not directly attack the validity of two-part rates, but they do argue inferentially that the only permissible rates are those which reflect average unit costs.

■ We agree with the Commission that it may approve the formulation of a two-part rate structure. The demand-commodity formula has long been a rate device of regulatory agencies and there can be no objection to the use of it (or any other formula) in designing the recovery of a pipeline's cost of service, absent some indication that the results of its application may be in violation of the Natural Gas Act. Demand-commodity methods producing different rates for different types of services have been justified both because it is thought that the costs necessitated by the various services differ, Mississippi River Fuel Corp. v. FPC, 82 U.S.App.D.C. 208, 163 F.2d 433, 437–438, (1947), and because of the principle that fuller use of closed utility systems involving fixed costs results in lower unit costs. National Coal Ass'n v. FPC, 101 U.S.App.D.C. 95, 247 F.2d 86, 87 (1957); Interstate Power Co. v. FPC, 236 F.2d 372, 381 (8th Cir. 1956),

cert. denied, 352 U.S. 967, 77 S.Ct. 352, 1 L.Ed.2d 321 (1957).

■ One factor present in most of the pipeline decisions in which demand-commodity formulas have been approved should be noted. Generally, these cases have involved the determination of costs to be allocated to the regulable and non-regulable portions of the business of interstate pipelines. Where a pipeline, for example, makes part of its sales directly to consumers and another part to public utilities for resale, only the latter sales are subject to regulation by the Commission. In order for the Commission to determine the reasonableness of the rates over which it has jurisdiction, the costs attributable to the regulable business must be ascertained.[9] The separation of fixed and variable costs normally performed in the formulation of demand-commodity rates thus serves an important function in the jurisdictional vis-à-vis nonjurisdictional rate case. This function, however, does not enter into the present case. Neither Natural nor Midwestern makes any significant nonjurisdictional sales, that is, direct sales to consumers. Here the two-part rate approved by the Commission must be judged by its application to the distributor-customers of the pipelines, Peoples, Northern Illinois, and NIPSCO. As to these companies, no reason has been suggested why a two-part rate is inappropriate; in fact, the distributors have suggested several reasons for encouraging such a rate structure even though only they, as jurisdictional customers of the same class, are involved.

The distribution companies have different "load factors," that is, the ratio of their firm peak demands to their total annual consumption differs because of their varying abilities to fill the valley

9. In Colorado Interstate Gas Co. v. FPC, 324 U.S. 581, 588, 65 S.Ct. 829, 833, 89 L.Ed. 1206 (1945), the Court stated: "The function which an allocation of costs (including return) is designed to perform in a rate case of this character is clear. The amount of gross revenue from each class of business is known. Some of those revenues are derived from sales at rates which the Commission has no power to fix. The other part of the gross revenues comes from the interstate wholesale rates which are under the Commission's jurisdiction. The problem is to allocate to each class of the business its fair share of the costs."

periods. The distributors argue, in line with the general theory discussed earlier, that a company with a higher peak demand in relation to total annual purchases has created, and therefore should be responsible for, a greater portion of the fixed costs of the system. The demand-commodity formula reflects these "varying patterns of cost responsibility," by relatively higher total billings against the low load factor distributor for the same number of delivered units.[10] The demand component of the two-part rate, a charge paid under contract irrespective of sales, also guarantees the pipeline a substantial portion of its revenues, thereby decreasing its risks. Additionally, the two-part structure encourages the construction of storage facilities which make possible lower consumer costs because storage facilities are less expensive to develop per unit than additional pipeline capacity and can be filled during valley periods to serve peak needs.

For these reasons, we think the demand-commodity formula per se is not subject to attack. Section 5(a) of the act provides no standard other than that rates approved by the Commission be just and reasonable. "[T]he Commission [is] not bound to the use of any single formula or combination of formulae in determining rates." FPC v. Hope Natural Gas Co., 320 U.S. 591, 602, 64 S.Ct. 281, 287, 88 L.Ed. 333 (1944).

As we stated earlier, however, it is not so much the choice of the formula as it is the selection of the levels of the components which presents the controversy. The principal rates finally approved by the Commission in its opinion and order are as follows: (1) Midwestern—a demand component of $3.03 per Mcf (thousand cubic feet) [11] and a commodity component of 22 cents per Mcf at 14.73 psia; (2) Natural—a demand component of $2.28 per Mcf [12] and a commodity component of 20.6 cents per Mcf at 14.65 psia. The Midwestern commodity rate of 22 cents per Mcf at 14.73 psia is equivalent to Natural's commodity rate of 20.6 cents per Mcf at 14.65 psia at equivalent BTU heating values, billings, and pressures. The coal associations allege that the commodity component levels were not reached by a process of cost allocation but rather were settled upon by agreement among the pipelines and the distribution companies in order to keep the commodity components at a level below the price of coal in certain industrial and utility markets. To a considerable extent the record supports this charge.

The price at which the distributors sell natural gas on an interruptible [13] basis in the industrial boiler fuel

10. In its earlier opinion dealing with Midwestern's proposed operation, the Commission noted that the estimated load factors of the three distributors were nearly identical and commented: "As long as the three customers remain the same at approximately the same load factor it will make no financial difference to Midwestern or any of the customers as to the respective levels of the demand and commodity components." Midwestern Gas Transmission Co., 21 F.P.C. 653, 661 (1959). In the instant proceeding, the Commission observed that because of the changed load factors of the distributors, Midwestern would have been justified in converting to a two-part rate even if it had originally elected to file a straight one-part rate.

11. Midwestern's certificate was issued with a demand component of $3.85 per Mcf and a commodity component of 22 cents per

Mcf on its southern system. Subsequent cost-of-service determinations and a reduction in the federal income tax were reflected by decreases in the demand component to $3.10 per Mcf and then to $3.03 per Mcf, while the commodity component remained unchanged.

12. The settlement reached in the section 4(e) proceeding (see footnote 6) set Natural's basic rate at a demand component of $2.40 per Mcf and a commodity component of 20.6 cents per Mcf. The reduction of the demand component to $2.28 per Mcf. reflects the federal income tax changes.

13. Interruptible sales are those subject to curtailment or stoppage as the needs of "higher priority," contract demand customers dictate. Such sales are made throughout the year by the distributors, whenever their contract demand customers

market to fill their valley periods is directly related to the commodity component of the pipeline rate to the distributors. The rates for industrial interruptible sales are set by the state regulatory commissions. The lowest of such rates are usually fixed at something in excess of the "incremental cost" of gas. The incremental cost is said to be the cost of the gas to the distributors plus local transportation costs plus state and local taxes. Significantly, the commodity component of the pipeline rate is·used as the cost of the gas. The demand component of the pipeline rate is disregarded by the state commissions for purposes of interruptible rates. The level of the pipelines' commodity component is therefore extremely important to the pipelines and the distributors, quite apart from the reasons discussed earlier.[14]

■ The coal associations have set out at length evidence from this proceeding, including evidence from other proceedings made a part of the record below, documenting the manner in which the commodity component levels of Midwestern's and Natural's rate designs were conceived. We do not understand that any of the other parties, including the Commission, disputes the general thrust of this evidence. In summary, it shows that the distributors and the pipelines used their best judgment in ascertaining the pipeline commodity level which would ultimately permit the distributors to compete with coal in the industrial boiler fuel market. Once the commodity component level necessary for this purpose was selected, the remaining step was simply to compute the level of the demand component which would insure the recovery of the remainder of the pipelines' total costs of service.

■■ The coal associations contend that such a process constitutes backward rate-making and that the Commission, by giving its approval to the result, became a party to the method. They say that rate designs must be constructed through cost allocations, not by pricing competitive products. We do not think the manner in which the rate designs of Natural and Midwestern were conceived by the pipelines and distributors for presentation to the Commission is of critical importance and we hold that the Commission's conclusion that the rates were just and reasonable within the meaning of section 5(a) finds adequate support in the record.

■ Our function in· reviewing the Commission's rate determinations is "necessarily narrow." Battle Creek Gas Co. v. FPC, 108 U.S.App.D.C. 209, 281 F.2d 42, 46 (1960). The Supreme Court has stated that because rate orders are the products of expert judgment, "he who would upset the rate order * * * carries the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences." FPC v. Hope Natural Gas Co., supra, 320 U.S. at 602, 64 S.Ct. at 288. More importantly, the test of fairness set for reviewing courts has been said to involve only the result of the rate order and not the manner of reaching it. In Hope the Court declared:

> [T]he question is whether [the] order "viewed in its entirety" meets the requirements of the Act. * * * Under the statutory standard of."just and reasonable" it is the result reached not the method employed which is con-

---

do not require all the gas available. Interruptible sales account for a high percentage of valley sales. The remainder of valley sales are "off-peak" sales, firm sales made only during the warmer months of the year.

14. The importance of the commodity components in the pipelines' rate designs was succinctly stated by the Commission: "They are important for the reason that

the State commissions apply a floor on industrial resale rates at the commodity cost of the gas plus incremental (local out-of-pocket) charges incurred in making deliveries. Thus, an increase ordered in Midwestern's and Natural's commodity components could be expected to be ultimately reflected in increases ordered by the State commissions in the distributors' rates."

trolling. \* \* \* It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end. The fact that the method employed to reach that result may contain infirmities is not then important. Ibid.

For this reason we are foreclosed from judging the rate order in the manner suggested by the coal associations and must confine ourselves to the "total effect" of the Commission's conclusions. When viewed in its entirety, the order may not be set aside.

█ The Commission took the total costs of service of both Natural and Midwestern and subclassified them to fixed and variable costs. By comparing the costs thus subclassified with the proposed rate designs, it found that Natural's commodity component included the recovery of approximately six cents of fixed costs per Mcf. It viewed this amount as "substantial," and noted its desire to keep Natural's rates in "competitive balance" with those of Midwestern. As to Midwestern, the Commission found that its commodity component contributed about one cent per Mcf toward the fixed costs on its southern system. The Commission said that this was a "small" contribution. It noted, however, that Midwestern was a subsidiary of

Tennessee and that as such Midwestern's sales contributed to the fixed costs of its parent. Together, the Commission stated, the commodity components of Midwestern and Tennessee "constitute a substantial contribution to fixed pipeline costs of both companies." [15] The Commission then observed that the pipelines, their customers, and the Commission's staff were all satisfied with the existing rate structure. It stated that the objectors, the coal associations, were interested only in a pipeline commodity level high enough to drive the distributors out of the utility boiler fuel market, and indicated that it did not wish to upset the "precarious" competitive situation existing in that market.[16]

█ From this view of the Commission's order, we cannot say that its total impact produces unjust or unreasonable consequences. The order approved rate structures governing the sale of gas from the pipelines to distribution companies. The coal associations' argument that these designs create "costs" which are subject to misinterpretation by state regulatory agencies is in large part irrelevant and in any event is one which should properly be addressed to the state commissions. In our judgment the Commission's order necessarily produces no arbitrary results.

█ The coal associations complain that the Commission did not follow

---

15. The Commission did impart this note of caution to Midwestern: "The contribution toward Midwestern's fixed charges from the commodity component is barely more than marginal and is far from completely satisfactory. We expect that in the future Midwestern will be able to reflect reductions in costs or increase revenues in improved contributions of its commodity charge to the operation of the Southern System. With this in mind, we shall continue to review the changes in Midwestern's costs and revenues reported to us."

16. The foregoing discussion answers the coal associations' contention that the Commission did not make sufficient findings of fact to support its order. The coal associations assumed the burden of proving that the rate designs of Natural and Midwestern were "unjust, unreasonable,

unduly discriminatory, or preferential;" the Commission could not change the rates filed unless substantial evidence was introduced to support such a conclusion. Sunray Mid-Continent Oil Co. v. FPC, 364 U.S. 137, 144, 80 S.Ct. 1392, 4 L.Ed.2d 1623 (1960). The Commission rejected the one-part rate formula proposed by the coal associations, toward which much of the evidence produced by the coal associations was directed. The Commission then made findings, based largely upon undisputed cost figures, in accordance with the demand-commodity formula used. These findings, albeit sketchy, are sufficient to support the order under review. "[T]he path which [the Commission] followed can be discerned." Colorado Interstate Gas Co. v. FPC, 324 U.S. 581, 595, 65 S.Ct. 829, 836, 89 L.Ed. 1206 (1945).

the formula created by the Commission for the allocation of fixed and variable costs in Atlantic Seaboard Corp., 11 F.P.C. 43 (1952). There the Commission concluded that the most equitable allocation would put fifty per cent of pipeline fixed costs in the demand component and fifty per cent in the commodity component. The Commission admittedly made no attempt to apply the *Seaboard* formula in this case, except to acknowledge by documentation that a "substantial deviation" from the formula was taking place. In fact, the Commission's orders have deviated markedly from *Seaboard* since that case was decided. The principal infirmity the Commission has found with the *Seaboard* allocation method has been that it does not give the Commission sufficient leeway to take into account competition from alternate fuel sources, Southern Natural Gas Co., 29 F.P.C. 323, 353 (1963), and between the pipelines themselves. Natural Gas Pipeline Co., 28 F.P.C. 731, 735 (1962). Here again, the Supreme Court's construction of the act indicates that the Commission is to be extended this discretion and that we are not to substitute our judgment except in cases of clear abuse. The Commission is free, the Court has said, "to make the pragmatic adjustments which may be called for by particular circumstances." FPC v. Natural Gas Pipeline Co., 315 U.S. 575, 586, 62 S.Ct. 736, 743, 86 L.Ed. 1037 (1942). The Commission's current position is that the commodity component of a two-part rate may be freely modified and that so long as the commodity component returns some not-precisely-definable portion of pipeline fixed costs, the rate will inure to the benefit of the distributors' contract demand customers, principally space heating customers. The correctness of this position is nowhere factually demonstrated in the record, but the rate design theory and the determinations of policy inherent in it are peculiarly within the Commission's competence, and be-

cause no indications to the contrary appear, it cannot be disturbed.

The coal associations next contend that the Commission exceeded its powers over wholesale gas rates by approving rate designs which effectively determine the intrastate price of natural gas for industrial boiler fuel. The answer to this contention has already been intimated. The Commission's rate order does not determine intrastate prices. The retail distribution rates of Peoples, Northern Illinois, and NIPSCO are determined by the state commissions, which are not bound to follow the rate designs structured for Natural and Midwestern. The Commission's order admittedly allows the state regulatory agencies to establish the off-peak and interruptible prices sought by the distribution companies, but inasmuch as the order does not bind the local bodies it does not exceed the powers of the Commission. This observation also answers the coal associations' objection that the Commission has no power to subsidize the ultimate consumer at the expense of "other segments of the economy" through the establishment of "artificial" rate structures. The rates approved by the Commission do no such thing. In any event the establishment of the lowest possible reasonable rates for the consumer accords with the avowed congressional purpose of the Natural Gas Act. Atlantic Refining Co. v. Public Service Comm., 360 U.S. 378, 388, 79 S.Ct. 1246, 3 L.Ed.2d 1312 (1959).

At the hearing before the examiner the coal associations offered evidence to show the impact of pipeline rates on the consumption of coal in the Chicago area. The examiner excluded the evidence as improper for consideration in a section 5(a) proceeding. The coal associations do not challenge the examiner's ruling directly [17] but seek to avoid it by other means. Thus they alternately argue competitive injury to

17. The coal associations expressly waived their objections to the exclusionary ruling in the interest of expediting the Com-

mission's decision in the rate design proceeding.

coal and assert that they are "persons" within that portion of section 4(b) (1) of the act, 15 U.S.C. § 717c(b) (1), which states that "no natural-gas company shall * * * make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage * * *." The coal associations say that the rate designs approved by the Commission grant an "undue advantage" to the distributors and subject coal producers to "undue prejudice," and that therefore their effect upon the coal industry should be considered in a section 5(a) proceeding to determine whether rates are "unjust, unreasonable, unduly discriminatory, or preferential." The examiner answered this contention by saying that section 4(b) (1) deals with discriminations and preferences between different gas customers and does not apply to the effect of gas rates upon competing fuels. In view of the congressional purpose of the act to protect consumers against exploitation, we think that this is the proper construction. The interpretation urged by the coal associations would produce a result contrary to the authority of FPC v. Hope Natural Gas Co., supra, and Alston Coal Co. v. FPC, 137 F.2d 740 (10th Cir. 1943), which held that the economic effect of pipeline rates upon competing fuels is not open for consideration in a section 5(a) proceeding. In Hope, the Court stated:

> It is also pointed out that West Virginia has a large interest in coal and oil as well as in gas and that these forms of fuel are competitive. When the price of gas is materially cheapened, consumers turn to that fuel in preference to the others. As a result this lowering of the price of natural gas will have the effect of depreciating the price of West Virginia coal and oil.
>
> * * * * * *
>
> We have considered these contentions at length in view of the earnestness with which they have been urged upon

us. We have searched the legislative history of the Natural Gas Act for any indication that Congress entrusted to the Commission the various considerations which West Virginia has advanced here. And our conclusion is that Congress did not. 320 U.S. at 609, 64 S.Ct. at 291.

■■■ The Commission takes the position that although a competitor may not intervene in rate proceedings under sections 4 and 5 of the act to argue his own injury, a competitor may participate in such proceedings to insure the protection of the public interest by offering evidence and argument relating to the factors pertinent to the Commission's determination. In this proceeding the coal associations are free to challenge the rates of Natural and Midwestern as "unjust, unreasonable, unduly discriminatory, or preferential," but only as the rates affect the distributors and their customers. Thus, even though the Commission considers competitive fuel prices in approving rate designs, competitors of the distributors may not urge competitive injury in design proceedings. This situation may seem anomalous, but for the reasons expressed in FPC v. Hope Natural Gas Co., supra, the matter is not open to question.

■■■ A similar resolution is required of the coal associations' contention that the rate designs approved by the Commission encourage inferior uses of natural gas contrary to the public interest. The coal associations point out that natural gas is a wasting asset, that its conservation is important, and that the Commission itself has long recognized that the use of gas for industrial boiler fuel is "under most circumstances of very questionable social economy." [18] They argue that the Commission should have considered conservation in its decision. In view of the Commission's general position on the use of gas in the generation of steam, as the coal associations suggest, there is a certain irony in

18. FCP v. Transcontinental Gas Pipe Line Corp., 365 U.S. 1, 11, 81 S.Ct. 435, 441, 5 L.Ed.2d 377 (1961), quoting from the Commission's annual report for 1940.

the Commission's statement in its opinion that the present "conflict" concerns the effort by coal "to displace natural gas" in the industrial boiler fuel market. However, the Commission is not authorized to consider the end use of natural gas in a rate proceeding, FPC v. Hope Natural Gas Co., supra, as distinguished from a certificate proceeding under section 7 of the act. FPC v. Transcontinental Gas Pipe Line Corp., 365 U.S. 1, 81 S.Ct. 435, 5 L.Ed.2d 377 (1961). Even in a section 7 proceeding, in which considerations of conservation are material to the issuance of a certificate of public convenience and necessity, end use is only one of many factors which may be considered by the Commission in the exercise of its discretion. In rate proceedings under section 5(a), conservation is not a factor which the Commission may consider. FPC v. Hope Natural Gas Co., supra; City of Detriot v. FPC, 97 U.S.App.D.C. 260, 230 F.2d 810, 817 (1955), cert. denied, Panhandle Eastern Pipe Line Co. v. City of Detroit, 352 U.S. 829, 77 S.Ct. 34, 1 L.Ed.2d 48 (1956).

Finally, the coal associations contend that the Commission's order violates the "national policy" underlying the antitrust laws. Most of their arguments are directed against the pricing practices of the distribution companies in the local industrial boiler fuel markets, but the coal associations do complain that the Commission permitted the practices to go unchecked by approving rate structures which were "artificially costed" through the concerted action of the pipelines and distributors. Without deciding to what extent the Commission may consider potential violations of the antitrust statutes in rate proceedings, we have determined to reject the antitrust arguments in summary fashion. The record shows that coal has been and still is the dominant fuel in the market in which it desires relief. For example, coal has maintained approximately eighty per cent of the power plant fuel market for several years, during which time the increase in the interruptible sales of the distributors in this market have been modest. No predatory actions or purposes nor any adverse competitive effects have presented themselves. The Commission's order continues the same rate structure under which these market conditions have existed. Further, independent purposes appear for the rate structure approved by the Commission and for the distributors' interruptible sales. Under these circumstances we cannot say the Commission has acted contrary to the spirit of the antitrust laws.

The record supports the findings of the Commission and warrants the conclusion that the rate designs of Natural and Midwestern are just and reasonable. The order is affirmed.