In the Matter of TILCO, INC., and its wholly owned subsidiaries, et al., Debtors.

No. 23662–B–2.

United States District Court, D. Kansas.

Jan. 23, 1976.

Landon T. Carlson, Mobil Oil Corp., Dallas, Tex., and Richard Jones, Jack D. Sage, Hershberger, Patterson & Jones, Wichita, Kan., for respondent Mobil Oil Corp.

R. J. Kepke, Anadarko Production Co., Houston, Tex., and Richard Jones, Jack D. Sage, Hershberger, Patterson &

Jones, Wichita, Kan., for respondent Anadarko Production Co.

Robert A. Miller, Jr., Kansas-Nebraska Natural Gas Co., Inc., Hastings, Neb., and Richard Jones, Jack D. Sage, Hershberger, Patterson & Jones, Wichita, Kan., for respondent Kansas-Nebraska Gas Co.

F. Vinson Roach, Patrick J. McCarthy, Robert J. Hammer, Omaha, Neb., and Christel E. Marquarot of Cosgrove, Webb & Oman, Topeka, Kan., for respondent Northern Natural Gas Co.

Blanchard, Walker, O'Quin & Roberts, Shreveport, La., and Edward F. Arn, Arn, Mullins, Unruh, Kuhn & Wilson, Wichita, Kan., for respondent Arkansas-Louisiana Gas Co.

C. C. Linley, Panhandle Eastern Pipeline Co., Liberal, Kan., and Robert W. Reed, Kansas City, Mo., for respondent Panhandle Eastern Pipeline Co.

Martha R. Steincamp, Kansas Corp. Commission, Topeka, Kan., for respondent State Corp. Commission of Kansas.

David C. Adams, Morris, Laing, Evans, Brock & Kennedy, Wichita, Kan., for respondent Phillips Petroleum Co.

Edward M. Doyle, Alexandria, La., for respondent Louisiana Interstate Gas Corp.

Spence A. Leamons, Fort Smith, Ark., for respondent Arkansas-Oklahoma Gas Corp.

Leland F. Cadenhead, Lilyan G. Sibert, Anthony D. Pryor, Houston, Tex., for respondent Tennessee Gas Pipeline Co., a Division of Tenneco, Inc.

These appearances have no attorney of record:

Kathol Natural Gas Co., Inc., Wichita, Kan.

Oklahoma Gas and Electric Company, Oklahoma City, Okl.

The Redco Corporation, Breckenridge, Tex.

State Railroad Commission of Texas, Austin, Tex.

Arkansas Public Service Commission, Jack Browne, Atty., Little Rock, Ark.

Federal Power Commission, General Counsel, Washington, D. C.

Oklahoma Natural Gas Company, Legal Department, Tulsa, Okl.

Louisiana Public Service Commission, Marshall B. Brinkley, General Counsel, Baton Rouge, La.

State Corporation Commission of Oklahoma, Oklahoma City, Okl.

## MEMORANDUM AND ORDER

WESLEY E. BROWN, Chief Judge.

*On Application of Trustee for Authority to Reject Executory Natural Gas Sales Contracts*

[Dkt. # 755]

On January 30, 1975, the Trustee made application to this Court for authority to reject thirty-three natural gas sales contracts entered into by the debtor corporations, as Sellers, pursuant to Sections 116(1), 216(4), of the Bankruptcy Act, 11 U.S.C.A. §§ 516(1), 616(4), and pursuant to the power reserved to the Trustee in the Second Amended Plan of Reorganization as confirmed by the Court. (Dkt. 755).

As grounds for rejection, the Trustee alleged in his application "that all of such contracts *are detrimental burdens* on the various debtor estates, and that the Trustee believes that it would be in the best interest of creditors of the various debtor estates for the Trustee to reject such executory gas purchase contracts, thereby enabling the purchasing parties under such contracts to become Class 5 creditors of the appropriate debtor estates." (¶ 5, Application; Emphasis supplied.)

A list of the gas purchase contracts in issue appears as an Exhibit to the Trustee's application, Dkt. 755, and the contracts themselves are in evidence as Exhibits 1–33.

An order to show cause was issued to gas purchasers under the contracts in question, responses were filed, and pretrial hearing was had upon the Trustee's application on March 5, 1975. (Transcript, Dkt. 808). At the request of the Bankruptcy Judge, post hearing briefs have been filed by the parties upon issues involving the jurisdiction of this

Court to approve rejection, the standing of the Trustee to make application for rejection, and the question of whether or not the gas purchase contracts are "burdensome" to the estate.

For the reasons hereinafter set out, the Court determines that the application of the Trustee to reject the contracts should be denied.

## THE STATUTES

Sections of the Act governing Chapter X Reorganizations make two provisions for rejection of executory contracts. Thus, Section 116 of the Act, 11 U.S.C. § 516(1), provides:

Upon the approval of a petition, the judge may, in addition to the jurisdiction, powers, and duties in this chapter conferred and imposed upon him and the court—

(1) permit the rejection of *executory contracts of the debtor, except contracts in the public authority,* upon notice to the parties to such contracts and to such other parties in interest as the judge may designate; . . . (Emphasis supplied.)

Section 216 of the Act, 11 U.S.C.A. § 616(4) provides that a Plan of Reorganization under Chapter 10 may itself provide for the rejection of executory contracts:

A plan of reorganization under this chapter—

(4) may provide for the rejection of any executory contract *except contracts in the public authority*; (Emphasis supplied.)

In the event that an executory contract is rejected, Section 202 of the Act, 11 U.S.C.A. § 602 provides that:

. . . any person injured by such rejection shall, for the purposes of this chapter and of the plan, its acceptance and confirmation, be deemed a creditor. . . .

■ Rejection of executory contracts in Chapter X proceedings requires judicial action and not merely administrative action or decision by the trustee in bankruptcy. *In re American National Trust,*

426 F.2d 1059, 1064 (7 Cir. 1970); *In re R. Hoe & Co., Inc.,* 508 F.2d 1126, 1130 (2d Cir. 1974).

The instant application from the Trustee arises from provisions included in the Trustee's Second Amended Proposed Plan of Reorganization, which was approved by this Court (Dkt. 683), and confirmed on November 11, 1974 (Dkt. 707).

Under the provisions of the Plan the Trustee arranged to sell to George B. Kaiser and Charles Schusterman (hereinafter, Kaiser and Schusterman) all shares of new common stock of the debtor, Tilco, Inc. (to be issued under the Plan), upon payment of $2,657,777.00 cash. Article IV of the Plan, as approved, specifically dealt with the gas purchase contracts now in issue: (Dkt. 680).

Upon notice and hearing, the Court may authorize the Trustee to reject any or all of the following executory contracts of the Debtor Leben Oil Corporation, and any other executory contracts of Debtor which the Trustee shall later determine should be rejected. To the extent, if any, which the Court may find such holders of executory contracts to be damaged by reason of such rejection, they shall become Class Five Creditors.

| Contracting Party | Type of Contract |
|---|---|
| Amoco Production Company | Gas Purchase Contract |
| Anadarko Production Company | " |
| Arkansas-Louisiana Gas Company | " |
| Amerada Hess Corporation | " |
| Kansas-Nebraska Natural Gas Co., Inc. | " |
| Louisiana Intrastate Gas Corporation | " |
| Northern Natural Gas Company | " |
| Panhandle Eastern Pipe Line Company | " |
| Tennessee Gas Pipeline Company | " |
| Florida Gas Transmission Company | " |
| Phillips Petroleum Company | " |
| Mobile Oil Corporation | " |
| Arkansas Oklahoma Gas Company | " |

Any claim arising out of the cancellation of an executory contract must be filed within 30 days from the date of the court order cancelling such contract.

On January 30, 1975, the Trustee filed "Application in Aid of Partial Consummation of Plan" (Dkt. 757), wherein he recited that he had received the balance

due for the purchase of Tilco, Inc. Class "B" common stock from Kaiser and Schusterman; that the Trustee had executed and delivered stock certificates to Kaiser and Schusterman, as provided in the Plan of Reorganization, and that upon delivery of stock certificates, "Trustee relinquished the possession and control of all the assets to be transferred as a part of the Plan of Reorganization."

On the same date, January 30, 1975, the Court entered its Order finding that the Trustee's report was in accordance with law and the Plan of Reorganization; that the "Closing Agreement" by and between the Trustee and Kaiser and Schusterman was "in proper form and is within the powers of the Trustee pursuant to Chapter X of the Bankruptcy Act;" that the debtor corporations should be discharged of all debts and liabilities; and that the property dealt with by the Plan, including the Tilco, Inc. Class "B" common stock, the assets of Tilco, Inc. and the stock and assets of its subsidiaries which have been transferred by the Trustee, pursuant to the Plan, "shall be free and clear of all claims and interests of the debtors, their creditors and stockholders . . ." (Dkt. 758).

The "Closing Agreement" approved by the Court (Ex. A, Dkt. 757) between the Trustee and Kaiser and Schusterman, bears a date of January 30, 1975, and makes the effective date of the sale retroactive to April 1, 1974. It recites the sale and delivery of 5,000 shares of Tilco Class B Common stock, and delivery and receipt of the balance of $2,591,333.00 purchase price. Paragraph 8 of this Closing Agreement pertains to the instant application for authority to reject gas purchase contracts. It provides that the Trustee agrees to pursue the application "diligently" and Kaiser and Schusterman agree to pay to the Trustee, as additional consideration for the Tilco Class B stock, 22½% of any increase in the contract price of gas previously dedicated under existing gas purchase contracts, for a term of three years following the date of any final order cancelling the existing contracts.

The terms of this agreement between the Trustee and Kaiser and Schusterman are as follows (¶ 8, Closing Agreement, Ex. A, Dkt. 757):

8. *Additional Proceedings by Trustee.* Trustee has heretofore filed in the Reorganization Proceedings an Application of Trustee for Authority to Reject Executory Natural Gas Sales Contracts (the 'Application') pursuant to which the Trustee seeks the approval of the United States District Court for the District of Kansas to reject certain specified Natural Gas Sales Contracts of the debtor Leben Oil Corporation as detrimental burdens of the debtor estate of such corporation (such contracts being hereinafter referred to as the 'Gas Contracts'). Trustee agrees to pursue such Application diligently and to use his best efforts to obtain court approval of the cancellation of the Gas Contracts. Kaiser and Schusterman agree to pay to the Trustee, as additional consideration for the Tilco Class "B" Stock purchased by them, a sum equal the difference between (1) the contract price per Mcf of natural gas specified in any Gas Contract cancelled by Final Order of any court of competent jurisdiction and (2) the contract price per Mcf of natural gas received by Tilco or any Subsidiary from the sale of natural gas from natural gas reserves previously dedicated to such cancelled Gas Contract, multiplied by 22½% of the quantity of gas actually sold during the first three years following the date of the Final Order of cancellation of such Gas Contract or Contracts. . . . The Trustee shall consult with Kaiser and Schusterman as to all actions to be taken by Trustee with respect to the Application, and, in the event that Kaiser and Schusterman advise the Trustee that, in their opinion, the Application should be dismissed with respect to one or more of the Gas Contracts, the Trustee shall so dismiss the Application. . . . In the event that the Trustee shall become entitled to receive monies pursuant to this paragraph 8, and shall thereafter de-

sire to sell such right, Trustee agrees that Kaiser and Schusterman shall have the right to meet any bona fide offer which Trustee shall receive for the purchase thereof. In the event Trustee shall receive such a bona fide offer from a third party, Trustee shall immediately advise Kaiser and Schusterman in writing of the terms of such offer and Kaiser and Schusterman shall have 30 days in which to exercise their right to meet such offer and purchase said right to receive monies.

## THE NATURAL GAS ACT AND JURISDICTION OF THE FEDERAL POWER COMMISSION

The preliminary question presented to the Court is whether or not it has power and jurisdiction to act *at all* upon the gas purchase contracts, in view of the provisions of the Natural Gas Act, 15 U.S.C.A. § 717 et seq., and the all-pervading control of the Federal Power Commission over interstate sales of gas dedicated under the various contracts.[1]

■ By statutory definition, the Trustee, and each of the respondent gas purchasers, is a "natural-gas company," for purposes of the Natural Gas Act. 15 U.S.C.A. § 717a.[2]

Section 717f(b) of the Act, 15 U.S.C.A., provides:

No natural-gas company shall abandon all or any portion of its facilities subject to the jurisdiction of the Commission, or any service rendered by means of such facilities, without the permission and approval of the Commission first had and obtained, after due hearing, and a finding by the Commission that the available supply of natural gas is depleted to the extent that the continuance of service is unwarranted, or that the present or future public convenience or necessity permit such abandonment.

Respondents here contend that an order from this Court authorizing the Trustee to reject the gas purchase contracts would be tantamount to abandonment of service by the Trustee; that the question of abandonment is exclusively within the jurisdiction of the Federal Power Commission, and that the Trustee's remedy, if any, is by administrative proceedings before the Commission, pursuant to guidelines established by the Natural Gas Act.

■ After review and consideration of the briefs and arguments of the parties, the Court finds that it does have jurisdiction to act upon the existing private contracts between the parties, without infringing upon the jurisdiction of the Federal Power Commission. The Trustee has not applied to this Court for authority to *abandon service* under the contracts. To the contrary, the Trustee admits that the debtor estate could not discontinue service to the gas purchasers without first obtaining Commission approval.[3]

1. *Some of the gas contracts involve intrastate sales, which would be subject to regulation in various respects by appropriate state agencies. See summary of provisions of gas purchase contracts provided by the Trustee, Exhibit to Brief, Dkt. 823.*

   In the Order to Show Cause issued upon the Trustee's application to reject the contracts, the following regulatory agencies were named as respondents: Kansas Corporation Commission; State Corporation Commission of Oklahoma; State Railroad Commission of Texas; Louisiana Public Service Commission; Commerce Commission of Arkansas; and, the Federal Power Commission.

   Only one state regulatory agency filed response—the Kansas Corporation Commission. The Federal Power Commission did not file a response or make appearance in these proceedings.

2. A "natural-gas company" means "a person engaged in the transportation of natural gas in interstate commerce, or the sale in interstate commerce of such gas for resale." The term "person" includes organized groups of persons, whether incorporated or not, and receivers, or trustees of such groups. 15 U.S.C.A. § 717a(1), (2), (6).

3. "The Trustee is fully aware that authorization for abandonment can be given only by the FPC. The Trustee is not asking this Court to permit the debtor estate to abandon its service to the gas purchasers." (Dkt. 823, p. 5).

■ The Commission, through the Natural Gas Act, acts upon and regulates the rights and duties of parties, which may exist under their private contracts, that is, the regulatory system under the Act is built on a foundation of private contracts. This distinction between the "service" provided the public, and the actual contract between parties is discussed in *Sunray Mid-Continent Oil Co. v. F. P. C.*, 364 U.S. 137, 154, 80 S.Ct. 1392, 1402, 4 L.Ed.2d 1623, 1634 (1960).

> (The Commission) has long drawn a distinction between the underlying service to the public a natural gas company performs and the specific manifestation—the contractual relationship—which that service takes at a given moment. . . . This position of the Power Commission is evidence that the service in which the producer engages is distinct from the contract which regulates his relationship with the transmission company in performing the service. . . . (364 U.S. at 152, 80 S.Ct. at 1404, 4 L.Ed.2d at 1634)
>
> During (the term of the contract), both parties are bound by it to the same extent as any members of this regulated industry. When it expires, (Sunray), to be sure, will be under an obligation to continue to deliver gas to United on the latter's request unless it can justify an abandonment before the Commission . . . The obligation that (Sunray) will be under after the contract term will not be one imposed by contract but by the Act. (Sunray) will be free then, as it was not free during the contract term under the contract here in question, to make rate changes under § 4 without United's consent. (364 U.S. at 155, 80 S.Ct. at 1403, 4 L.Ed.2d at pp. 1635–1636)

See also, *United Gas Pipe Line Company v. Federal Power Commission*, 350 F.2d 689 (5th Cir. 1965), *aff'd*, 385 U.S. 83, 87 S.Ct. 265, 17 L.Ed.2d 181; *Amoco Production Company v. Federal Power Commission*, 491 F.2d 916 (10th Cir. 1973); and *In re Chicago Rapid Transit Co.*, 129 F.2d 1 (7th Cir. 1942), *cert. denied, sub nom. Chicago Junction R.R. Co.*, 317 U.S. 683, 63 S.Ct. 205, 87 L.Ed. 547. In the latter case, *In re Chicago Rapid Transit*, a state regulatory statute prohibited abandonment of public service without approval of the Illinois Commerce Commission. In affirming the trial court's determination that a lease on certain trackage could be rejected, the Court of Appeals noted that the lower court had made "a nice distinction . . . between what it might properly do and what it might not. It could reject the lease and free the estate of the burden thereof. It could not order abandonment of service. It could not make a new contract between the parties." 129 F.2d at 6. The Court further stated, 129 F.2d at 8:

> (The Illinois statute) forbidding abandonment or discontinuance of an existing service without consent of the Commission applies only to physical abandonment by the utility. It does not refer to an involuntary change in legal obligations between the parties . . . the order to reject did not work abandonment of service. Rather, it was court action working an involuntary legal change in obligations.

By reason of the distinction to be made between the concept of the "service" rendered by a natural gas company to the public, and the underlying contractual relationship between private parties which regulates their individual relationships, one to the other, the Court concludes that it has jurisdiction and power to act upon those private contracts pursuant to Sections 116, 216 of the Act without infringing upon the jurisdiction of the Federal Power Commission under the Natural Gas Act.

### CONTRACTS "IN THE PUBLIC AUTHORITY"

Both Section 116 and 216 of the Bankruptcy Act specifically withhold from this Court the power to permit rejection of executory contracts *"in the public authority."* The parties have supplied the Court with exhaustive briefs concerning their views as to what contracts are en-

compassed within this phrase. The respondent gas purchasers contend that the contracts, subject as they are to control by the Federal Power Commission, are clearly affected with a public interest, and as such, are exempt under the statutes. The Trustee, on the other hand, relies on the legislative history surrounding inclusion of the exception, as reported at 6 Collier on Bankruptcy, ¶ 3.23(7), pp. 589 et seq., and asserts that the exception should be clearly limited to contracts *with* a municipality or other public body.

Collier states, ¶ 3.23(7), at p. 590 that:

What is included in the phrase 'in the public authority' has not been judicially defined, but the exception was included to prevent cancellation of contracts with a public agency or body, such as a municipality, where a public interest is involved.

In support of such conclusion, Collier notes that in earlier versions of the Act of 1938, the draftsmen proposed to eliminate entirely from Chapter X the limitation upon the Court's power to permit rejection of executory contracts, but that "upon the strenuous insistence of an active group from New York City," the restriction was reasserted and made applicable to rejections by the judge under § 116(1) as well as by a reorganization plan under § 216(4). The "active group from New York City" appears to have been led by Mayor LaGuardia, and was motivated by a desire to protect the 5-cent subway fare. At Senate hearings, he is quoted as stating: (6 Collier ¶ 3.23[7], f. n. 83, pp. 589–590).

'For illustration, the City of New York has invested a quarter of a billion dollars in municipally owned subways. The lines are privately operated under contracts between the city and public-utility corporations wholly intrastate in character. The Interborough Rapid Transit Co., one of these utilities, is at present in Federal equity receivership.

The Interborough receiver has applied for leave to reject what he deems to be the onerous provisions of the Interborough's contracts with the city. The Chandler bill admits Interborough to the advantages of 77B. If the bill is not amended, it will be claimed that, upon entering bankruptcy Interborough is automatically liberated from any restrictions against rejecting an unprofitable contract—even if it is a contract in the public authority.' . .

See also statement of Commissioner R. J. Haskell: 'For many years the transit commission has fought one legal maneuver after another by the companies to set aside the 5-cent fare provisions of the dual subway contracts. The latest menace to the 5-cent fare makes its appearance in the Chandler bill to revise the National Bankruptcy Act. The transit commission strongly objects to the provisions of this bill and seriously questions the wisdom of a third.

'The Commission takes exception to the provisions which would remove the veto power which State regulatory bodies now have over any reorganization plan presented by a purely intrastate public utility *and the provision which would take from the present act the special protection given public contracts.*' (Emphasis supplied.)

As noted by Collier,[4] judicial definitions of the phrase, "in the public authority" are scarce, and for all practical purposes, are non-existent. In 1941, the District Court for the District of West Virginia, expressed an opinion that deposits made under contract with a state insurance department were not contracts "in the public authority." *In re Fidelity Assur. Ass'n,* 42 F.Supp. 973, 989 (D.C.W. Va.1941), *reversed on other grounds, sub nom. Sims v. Fidelity Assur. Ass'n,* 129 F.2d 442, *affirmed,* 318 U.S. 608, 63 S.Ct. 807, 87 L.Ed. 1032. In the case of *Chicago Rapid Transit Co., supra,* 129 F.2d 1, the Seventh Circuit held that Chapter X

---

4. Remington takes no position as to the definition of that term, although the exclusion is discussed under the heading, "Public Service Contracts." See 11 *Remington on Bankruptcy* § 4396, p. 89.

of the Bankruptcy Act had no application to the issues at hand, but added that: (129 F.2d at p. 8).

Even adopting respondent's contention that the court may not upset contracts in the public authority, the situation here is not within that phrase. We are dealing with a lease between two utility corporations. To hold this contract "in the public authority" would effectuate inequitable preferences of an unsecured creditor,—the lessor in a burdensome lease. . . .

In contending that the gas purchase contracts in issue are clearly within the exception provided for contracts "in the public authority," the respondent gas purchasers point to the all-inclusive regulatory scheme provided by the Natural Gas Act, discussed *supra,* and would have the court read the exception to apply to "contracts affected with a public interest," or "contracts regulated by public authority." The Court believes, however, that the exception to this Court's authority and jurisdiction should not be so broadly construed. Many private contracts are "affected with a public interest." Most enterprises in these times are regulated in some form by federal or state administrative bodies. The Court believes that if total restraints were imposed on the power of a reorganization court to allow rejection of contracts "affected with a public interest," the laudable purposes of the relief provisions of Chapter X would be frustrated and perhaps defeated in many instances.

In this connection, the Court has noted that some courts have recently ruled that a reorganization court has power to permit rejection of collective bargaining agreements. Thus in *Brotherhood of Railway, etc. v. REA Express, Inc.,* 523 F.2d 164 (2nd Cir. 1975), the Court held that executory collective bargaining agreements, subject to provisions of the Railway Labor Act, might be rejected, provided a determination was made that the contracts were sufficiently onerous and burdensome to warrant rejection. This action was filed under Chapter XI of the Act, and is distinguishable, of course, because the Court acted under Section 313(1) of the Act, 11 U.S.C. § 713(1) which does not contain an exception for contracts "in the public authority." [5]

The Court believes this case to be instructive however, to the extent that the Second Circuit discussed at length the interplay between objectives to be accomplished under the Bankruptcy Act, in situations which were subject to the National Labor Relations Act, and determined that in the absence of a "clear Congressional mandate to the contrary," [6] the "enforcement of a collective bargaining agreement must yield to the bankruptcy court's power to relieve the debtor's successor in bankruptcy immediately of onerous and burdensome executory contracts." (523 F.2d at 168–169).

For the foregoing reasons, the Court concludes that the exemption provided in Sections 116 and 216 of the Act, 11 U.S.C. §§ 516(1), 616(4) for contracts "in the public authority" should be limited to contracts with a public agency or body, such as a municipality, where a public interest is involved. The Court

---

5. Section 313(1), 11 U.S.C. § 713(1) provides: "Upon the filing of a petition, the court may, in addition to the jurisdiction, powers, and duties conferred and imposed upon it by this chapter—
(1) permit the rejection of executory contracts of the debtor, upon notice to the parties to such contracts and to such other parties in interest as the court may designate."

6. A "clear congressional mandate to the contrary" is provided by § 77(n) of the Act, 11 U.S.C. § 205(n) which provides that "no judge or trustee acting under this (Act) shall change the wages or working conditions of railroad employees except in the manner prescribed in (the Railway Labor Act).

The Second Circuit noted that under this provision, "Congress, by enacting § 77(n) of the Bankruptcy Act, 11 U.S.C. § 205(n) which excepts 'railroad employees' from the operation of § 313(1), demonstrated that it 'knew how to remove labor agreements from the scope of a general power to reject executory contracts.'" 523 F.2d at 169.

further concludes that the thirty-three gas purchase contracts in issue here are *not* contracts "in the public authority."

## THE GAS PURCHASE CONTRACTS ARE "EXECUTORY CONTRACTS"

Under Sections 116, and 216 of the Act, the power of the Court to permit rejection of contracts is limited to those contracts which are "executory" in nature.

The respondent gas purchasers contend that their rights are vested under their agreements and that the contracts are not "executory" in nature. In support of this contention, they point to various provisions in the contract whereby the debtor has committed its reserves to performance of the contract, and the enormous expenditures made by the purchasers in constructing gathering lines and distribution systems in reliance upon such commitments. A typical "commitment" clause appears in the Anadarko contract, Exhibit 1, for a term of twenty years and thereafter so long as gas can be produced from the contract acreage in commercial quantities:

WHEREAS, Seller owns or controls oil and gas leases covering the lands described . . . and agrees to sell gas which may be produced therefrom to Buyer . . .; and

WHEREAS, Buyer is engaged in the business of purchasing and gathering gas and transporting and selling such . . . and wishes to buy gas produced from Seller's above-described lands . . . and

WHEREAS, it is the mutual desire of the parties that Seller's interest in the gas which may be produced from the above-described lands *shall be committed to this Agreement during the term hereof*; . . . (Emphasis supplied.)

\* \* \* \* \* \*

2.1 Commitment: Seller hereby commits to the performance of this Agreement all of the gas which can be commercially produced from Seller's leases constituting the contract acreage . . .

The Kansas-Nebraska Natural Gas Company contract, Exhibit No. 14, contains this language:

Section 1. Seller represents that it is the owner of and holds valid and subsisting oil and gas leases or interests therein under the lands in Rush County, Kansas . . . and agrees that its interests in said lands and leases . . . are included in and covered by this contract *and are dedicated to the performance of Seller's obligations hereunder.* (Emphasis supplied.)

The Northern Natural Gas Company contracts (Exhibits 17–19) contain this language of commitment:

Subject to the provisions hereof, Seller agrees that the interest in the oil and gas leases . . . now owned by Seller or acquired by Seller during the term of this Contract, the acreage and estate covered thereby, and the gas wells now or hereafter drilled thereon *are exclusively committed to the fulfillment of this agreement,* and, . . . Seller agrees not to sell gas to any other parties from any such lease or well so long as the same remains committed to the performance hereof." (Article X, Section 3, Ex. 17)

This Contract shall bind and inure to the benefit of the parties hereto, their successors and assigns *and shall constitute a covenant running with the land and leasehold estates covered hereby.*" (Article XIV, Section 3, Ex. 17). (Emphasis supplied.)

It appears that the term "executory contract" is not defined in Chapter X, and again, the Court is faced with a broad and ambiguous term which is sharply in dispute between the Trustee and respondent gas purchasers. It is clear that the term includes unexpired leases on real property. See discussion, 6 *Collier on Bankruptcy,* ¶ 3.23, pp. 563–564. But see, *Laugharn v. Bank of America Nat. Trust & Savings Ass'n,* 88 F.2d 551 (9th Cir. 1937), *cert. den.,* 301

U.S. 699, 57 S.Ct. 929, 81 L.Ed. 1354 where an oil and gas "lease" was held not to be an executory contract, but a conveyance of an interest in real property under California law.

Williston on Contracts states the problem of determining the executory nature of contracts in these words (1 *Williston, Contracts* § 14, pp. 27, 28):

> If a transaction is fully executed on both sides, it is not properly described as a contract. The term 'executed contract' has, however, been sometimes used to describe executed consensual agreements, like sales completely carried out on both sides. The same term has also been used to describe unilateral contracts which are executed only on one side, as sales where the price has not yet been paid. Since the phrase if understood in the former meaning contains an improper use of the word 'contract,' and in any event is ambiguous, its use is better avoided. The same criticism, so far as ambiguity is concerned, applies to the phrase 'executory contracts.' *All contracts to a greater or less extent are executory. When they cease to be so, they cease to be contracts.* (Emphasis supplied.)

In *Farrington v. Tennessee*, 95 U.S. 679, 683, 24 L.Ed. 558, 559 (1878), the nature of contracts was explained in this language:

> Contracts are executed or executory. A contract is executed where everything that was to be done is done, and nothing remains to be done . . . . An executory contract is one where it is stipulated by the agreement of minds, upon a sufficient consideration, that something is to be done or not to be done by one or both the parties.
> . . .

The Court has examined each contract at issue in the Trustee's application. They are complex instruments which contain various terms relating to quantity, pressure, term, price, determination of reserves, "minimum takes," and the duties of the Buyer and the Seller. Some are subject to unilateral termination upon a determination that production of gas is no longer "commercially feasible," or no longer meets quality standards of the Buyer.[7] The Seller is frequently required by contract to operate its wells in a manner required by Buyer, to install testing equipment, regulate pressures and volume. Some of the contracts expressly recognize that the production of gas is secondary to the Seller's primary interest in producing oil. Thus, a contract with Phillips-Mobil, Ex. No. 31, provides:

> XV. PRIORITY RIGHTS OF SELLER—As said premises are being operated primarily for the production of oil, the taking of gas by the Buyer shall be subservient to said oil operation. The Seller may, at any time, without liability to Buyer clean out, deepen or abandon any well or wells on the above-described properties, or may use any efficient, modern or improved method for the production of oil . . . . .

Incidentally, this particular contract, Ex. 31, contains elaborate provisions for pricing according to gasoline content of the gas delivered for processing in Buyer's plant, and Buyer and Seller contemplate a type of "partnership" and division of profits from sales of gasoline, with Buyer paying Seller a portion of proceeds from the sale of "additional products" extracted from the gas, such as butane and propane.

---

7. The Phillips-Mobil contract, Exhibit 31, contains this provision:

"XI. UNPROFITABLE GAS—In the event the operation of Buyer's plant becomes unprofitable, in the judgment of Buyer, or in the event the gas from any well or wells is or becomes insufficient in pressure or volume or for any other reason is or becomes unprofitable to connect to any of the gathering systems or to reconnect from one system to another, in the judgment of Buyer, Buyer shall have the right to discontinue the operation of its plant or refuse or cease taking the gas from any such well or wells so long as such condition exists or may terminate this contract upon thirty (30) days' notice in writing to Seller as to any such well or wells."

In the ordinary sense of the word, the contracts are clearly executory. No payment has been made, or is yet due for undelivered gas. The contracts typically contain language to the effect that title to the gas passes upon delivery.[8] In *Foster v. Atlantic Refining Co.,* 329 F.2d 485, 489 (5th Cir. 1964), the Court described the nature of a gas purchase contract in this manner:

> . . . the . . . contract was an *executory contract* for the sale of gas with an *executed sale of gas* being effected when the gas came into possession of the pipeline. (Emphasis supplied.)

In *Workman v. Harrison,* 282 F.2d 693 (1960), the Tenth Circuit held that a joint venturer had no vested interest in land under development because under the contract his rights were dependent upon future performance of the contract. At page 699 of 282 F.2d, the Court observed:

> The contract was then executory in nature, neither party having completely performed and the obligations of each remaining complex.

> There can be little doubt that the ultimate success of Capitol was highly speculative and that to go forward would require (Debtor) to expend large sums of money . . . The trial court properly permitted the rejection pursuant to Sec. 116 of the Bankruptcy Act, 11 U.S.C.A. § 516.

In another Tenth Circuit case, *King v. Baer,* 482 F.2d 552 (1973), *cert. den.,* 414 U.S. 1068, 94 S.Ct. 577, 38 L.Ed.2d 473, one King had entered a contract with the debtor corporation for purchase of an interest in a Canadian oil exploration permit, and had made the first payment due under the contract. Upon the Trustee's application to reject the contract, King contended that he had a vested property interest in the permit, that the contract was therefore not "executory," and the reorganization court had no jurisdiction to permit rejection. The Court of Appeals held that the trial court correctly found the contract to be executory and properly permitted its rejection. See also, *In re American Magnesium Company,* 488 F.2d 147, 152 (5th Cir. 1974), involving mineral leases and production royalties, where the court found the contract to be executory in view of "ongoing commitments."

■ With respect to the gas purchase contracts now before this Court, it is apparent that legal title to the undelivered gas which is the subject of the contract has not been conveyed and the purchase price for this gas has not been paid. The Court is satisfied that the thirty-three contracts in issue are "executory contracts," within the meaning of Sections 116 and 216 of the Bankruptcy Act.

## STANDING OF THE TRUSTEE

■ Sections 116, 216 of the Act permit the rejection of executory contracts *"of the debtor."* Due to the particular and perhaps unusual circumstances of this case, whereby the Trustee transferred title to the contracts to Kaiser and Schusterman, the Court must conclude that the contracts are not contracts *of the debtor,* and the Trustee has no standing to reject them "after the fact" of sale and transfer.

As noted in the initial discussion in this Memorandum, the Plan of Reorganization was confirmed by this Court on November 11, 1974. (Dkt. 707). The Plan itself did not "provide for the rejec-

---

**8.** Exhibit 6, Section 4, of an Arkansas Louisiana Gas contract contains this language:

> "The gas shall be delivered and title and responsibility for said gas shall pass to Buyer at the inlet of Buyer's metering facilities to be located at the delivery points for the gas deliverable hereunder . . ."

Exhibits 7 thru 13 contain similar language.

The Panhandle Eastern contracts contain this language (Exhibits 21–29):

> "Seller shall furnish a suitable valve at each point of delivery for Buyer's connection and each point of connection between the facilities of Buyer and Seller at each point of delivery shall constitute the point at which ownership, title and control of the gas shall pass from Seller to Buyer."

tion of any executory contract," as authorized by Section 216 of the Act, 11 U.S.C.A. § 616(4). Instead, the Plan provided that "Upon notice and hearing, the Court *may authorize* the Trustee to reject any or all of the following executory contracts of the Debtor Leben Oil Corporation, and any other executory contracts of Debtor which the Trustee shall later determine should be rejected." (Emphasis supplied.)

On January 30, 1975, a number of things occurred: The Trustee filed his "Application in Aid of Partial Consummation of Plan," stating that he had "relinquished possession and control of all the assets to be transferred as a part of the Plan of Reorganization;" the Trustee executed a "Closing Agreement" with Kaiser and Schusterman; the Court entered its Order approving the Closing Agreement, and determining that the stock and assets of the debtor, transferred under the Plan, were free and clear of all claims (Dkt. 758); and the Trustee also filed the application in controversy here—the application for authority to reject the thirty-three gas purchase contracts (Dkt. 755).[9]

The terms of the Closing Agreement (Ex. A, Dkt. 757) between the Trustee and Kaiser and Schusterman include the following:

. . . Tilco does hereby sell, transfer and deliver to Kaiser and Schusterman, for the consideration hereinafter provided, 5000 shares of the Tilco Class "B" Common Stock, being all of the issued and outstanding capital stock of Tilco . . . .. Kaiser and Schusterman hereby purchase 5,000 shares of the Class "B" Common Stock of Tilco, and in full consideration therefor, hereby deliver to Tilco, in addition to the $66,444.00 previously delivered to Trustee in accordance with the provisions of the Trustee's Invitation to Bid, the cash consideration of $2,591,333.00, the receipt of which is hereby acknowledged by Tilco.

Paragraph 9 of the Agreement provided that the effective date of the sale was April 1, 1974.[10]

The legal effect of the arrangement between the Trustee and Kaiser and Schusterman is clear—Kaiser and Schusterman, at this point in time, on January 30, 1975, and on April 1, 1974, owned all beneficial interests in the gas purchase contracts which the Trustee now seeks to reject. *Cf. First State Bank & Trust Co. of Guthrie, Okla. v. Sand Springs State Bank,* 528 F.2d 350 (10th Cir., 1976), where Trustee admittedly had no interest in the certificates of deposit which were in issue.

The Court must conclude that on January 30, 1975, the thirty-three gas purchase contracts in issue were *not* "executory contracts *of the debtor*," subject to rejection within the meaning of Sections 116(1), 216(4) of the Bankruptcy Act.[11]

9. At the hearing upon the application, some discussion was had concerning the actual time of day, and sequence in which the Trustee's petitions were filed. According to docket numbers affixed to the original papers, the Application to reject the contracts was filed first; a notice of hearing on the application, second; the application of the Trustee "In Aid of Partial Consummation of Plan," with Closing Agreement, was filed third; and the Order of the Court approving the application for partial consummation was filed fourth. The Court does not deem the sequence of filings and docket entries of particular importance to its decision upon the issue of the Trustee's standing.

10. "9. *Effective Date and Closing.* The effective date of the sale provided for herein shall be April 1, 1974, at 7:00 A.M., Central Day-

light Time, with the closing to be at 12:00 o'clock noon, Central Standard Time, January 30, 1975, in Wichita, Kansas."

In the Plan of Reorganization which was confirmed in November, 1974, Article X, Section E, provided that certain assets of the Debtor should be retained by the Trustee. Included in the retained assets were: all accrued oil and gas runs and accounts receivable as of 7:00 A.M., April 1, 1974; All cash in banks and certificates of deposit as of 7:00 A.M., April 1, 1974, and all accrued management fees as of 7:00 A.M., April 1, 1974.

11. The "effective date of rejection" is the actual date of rejection. 6 *Collier on Bankruptcy,* § 3.24[1]; *In re M & S Amusement Enterprises, Inc.,* 122 F.Supp. 364, 366 (D.C.Del.1954).

■ The parties have also exhaustively briefed the question of whether the contracts themselves are "detrimental burdens to the estate," meriting rejection. While it is unnecessary to reach this question, in view of the Court's conclusion that the Trustee has no standing to disaffirm the contracts, the Court will further find, upon the merits, that rejection of the contracts would be of no benefit to the creditors of the estate. At the hearing on the Trustee's application, the attorney for Kaiser and Schusterman contended that the creditors had already received a benefit because Kaiser and Schusterman had paid a premium price for the assets of Tilco, upon the "expectation" that the Trustee would be authorized to reject the contracts, and better terms could then be negotiated by Kaiser and Shusterman.

■ As a general rule, the Court believes that rejection of executory contracts should be permitted only where such contracts are shown to be "burdensome" or disadvantageous to the debtor's estate and to the interests of its creditors. The rule is stated in 6 *Collier on Bankruptcy*, ¶ 3.23(4) pp. 571–573, in this language.

Section 116(1) does not make mandatory the rejection of executory contracts, but leaves the matter to the discretion of the judge, without describing the circumstances warranting the exercise of the power conferred. The problem involved is one of assumption or rejection of burdens or liabilities in the light of consequent advantage to the estate. If a contract, even though it requires further performance or further duties, is on the whole beneficial to the debtor's es-

tate, its rejection should ordinarily be denied. But where the contract is detrimental or unduly onerous, its rejection should be permitted.

The Trustee contends that the "business judgment" of a Trustee should prevail, citing those cases in which a contract, although "beneficial" in one sense of the term, under all the circumstances appears "disadvantageous" in the sense that the Trustee might negotiate better terms elsewhere.[12]

In *In re American National Trust, supra,* 426 F.2d 1059, 1064, the Court stated the rule in this manner:

. . . the basic purpose of a Chapter X proceeding (is) the rehabilitation of the debtor corporation and the preservation of its going-concern value. If an executory contract is determined to be detrimental or onerous and thereby might hinder an effective reorganization its rejection should be authorized. *Workman v. Harrison,* 10 Cir., 282 F.2d 693, 699. Conversely, if the contract is of benefit to the debtor and facilitates reorganization, assumption is warranted.

■ The Trustee has the burden of showing that the contracts are or were a burden to the estate. This is a fact question which could require a hearing and a factual determination by the Court. However, the files and the pretrial record in this case disclose that these contracts provided the estate with substantial net revenues.

Financial reports filed by the Trustee covering his administration of the estate for the period February 16, 1973 through December 31, 1973 (Dkt. 554) indicate that total revenue for Leben Oil Compa-

---

12. E. g., *Workman v. Harrison, supra,* 282 F.2d 693 (speculative nature of the contract); *Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific R. Co.,* 318 U.S. 523, 549, 63 S.Ct. 727, 742, 87 L.Ed. 959, 999 (1943) (question is one of business judgment); *Flying W Airways, Inc.,* 328 F.Supp. 1256 (E.D.Pa.1971), (hangar lease found not to be "advantageous"); *King v. Baer, supra,* 482 F.2d 552; and see *In re R. Hoe & Co., Inc., supra,* 508 F.2d 1126. (Trustee successfully negotiated

payment of premium price for completion of manufacture of printing presses).

The reasons for rejection of the contract in *King v. Baer, supra,* 482 F.2d 552 do not clearly appear in the opinion of the 10th Circuit. The Trustee has informed us, through lengthy quotations from the briefs and arguments before the Circuit that the value of the Canadian oil exploration permit, which was the subject of the contract, vastly exceeded the contract price.

ny for that period was $873,037.48. Of these revenues, $695,991.68 were generated by gas and oil sales. The balance of revenues was derived from management fees, overhead charges and sale of leases. The lease operating expenses for this same period were $597,160.79, and the net income to the estate during this accounting period was $107,688.07.[13]

Chapter X provisions are for the protection of the debtor's estate and its creditors, and not for the purpose of improving the position of third parties, such as a purchaser of a bankrupt's assets. As we have pointed out, the contracts were in effect sold to Kaiser and Schusterman, and title passed to them through the stock conveyances, approved by the court. The Trustee has failed to establish that the gas purchase contracts are now, or were, at any time, an onerous burden to the estate.

In view of the foregoing discussion, the Court concludes:

a) The Chapter X reorganization court has jurisdiction and power to act upon the gas purchase contracts, without infringement upon the jurisdiction of the Federal Power Commission provided by the Natural Gas Act;

b) The gas purchase contracts are not contracts "in the public authority" within the meaning of Sections 116, 216 of the Bankruptcy Act;

c) The gas purchase contracts are executory contracts within the meaning of Sections 116, 216 of the Bankruptcy Act;

d) The gas purchase contracts are not contracts "of the debtor" inasmuch as all of the corporate stock and assets of the debtor corporation, including the contracts, had previously been sold, assigned and transferred to Kaiser and Schusterman pursuant to the Plan of Reorganization; and

e) The gas purchase contracts in question were not, and are not detrimental burdens to the debtor estate, and their rejection could not be of any possible benefit to the debtor estate or its creditors.

For the foregoing reasons, the Court is of the opinion, and so concludes that the Application of the Trustee for Authority to Reject Gas Purchase Contracts should be denied. Accordingly,

It is ordered that the Application of the Trustee for Authority to Reject Executory Natural Gas Sales Contracts (Dkt. 755) be, and it is hereby Denied.

---

13. Other reports covering operations in 1974 indicate that oil and gas sales constituted the greater part of revenues accruing to the estate: (Dkts. 559, 584, 601, 616, 661).

| | Total Revenues | Oil and Gas Sales |
| --- | --- | --- |
| 1/31/74 | $ 133,575 | $ 130,786 |
| 3/31/74 | 101,314 | 109,835 (sic) |
| 4/30/74 | 129,560 | 111,566 |
| 5/31/74 | 138,718 | 117,722 |
| 6/30/74 | 171,374 | 102,823 |